The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **January 16, 2024**

**No. A-1-CA-40561**

**CARL J. BUTKUS,**

Plaintiff-Appellant,

v.

**PUBLIC EMPLOYEES RETIREMENT ASSOCIATION; PUBLIC EMPLOYEES RETIREMENT BOARD; and their members in their official capacities, FRANCIS PAGE; STEPHEN J. NEEL; PAULA FISHER; DIANA ROSALES-ORTIZ; CLAUDIA ARMIJO; JOHN MELIA; LAWRENCE L. DAVIS; SHIRLEY M. RAGIN; ROBERTO RAMIREZ; LORETTA NARANJO-LOPEZ; MAGGIE TOULOUSE OLIVER; and TIM EICHENBERG,**

Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Maria Sanchez-Gagne, District Court Judge**

Giddens & Gatton Law, P.C.
George Dave Giddens
Albuquerque, NM

Carl J. Butkus
Albuquerque, NM

for Appellant

NM Local Government Law, LLC
Charles Rennick
Albuquerque, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge, retired, sitting by designation.**

{1}     This case—certified to this Court by the district court—requires this Court to interpret the Judicial Retirement Act (JRA), NMSA 1978, §§ 10-12B-1 to -19 (1992, as amended through 2023), and resolve a single question about retirement benefits for a group of judges and justices who initially became members of the Judicial Retirement Fund (the Fund) after June 30, 2005, but on or before June 30, 2014. Plaintiff Carl Butkus, a retired district court judge, argues the Public Employees Retirement Board (the Board) miscalculated his pension when it determined that "years of service" in Section 10-12B-9(C)(1) refers to a member's years of service between June 30, 2005 and June 30, 2014, instead of the retiree's full tenure as a judge or justice in the two pronged calculation required by Section 10-12B-9(C). For the reasons set forth below, we affirm.

**BACKGROUND**

{2}     The facts of this case are undisputed. Plaintiff started his tenure as a judge on December 16, 2005. Plaintiff retired as a judge under the JRA effective January 1, 2021. Plaintiff retired with a total service credit of fifteen years and one month.

{3}     Upon his retirement and submitting the necessary paperwork, the Public Employees Retirement Association of New Mexico (PERA) calculated Plaintiff's pension. Plaintiff disagreed with PERA's calculation and appealed the action to the

Board. After PERA provided a written response to Plaintiff's notice of appeal, the administrative hearing officer (AHO) held a video conference hearing. The AHO issued a recommended decision. Plaintiff responded to the recommendation and the AHO replied with her own written response. The Board issued a final order adopting the AHO's recommended decision.

{4}     Plaintiff appealed the Board's decision to the district court, pursuant to Rule 1-074(A) NMRA. After briefing and a video hearing, the district court certified the matter to this Court pursuant to Rule 1-074(S). After certification was accepted, this appeal followed.

**DISCUSSION**

{5}     In reviewing an administrative agency's decision, this Court is "limited to determining whether the administrative agency acted fraudulently, arbitrarily or capriciously; whether the agency's decision is supported by substantial evidence; or whether the agency acted in accordance with the law." *Paule v. Santa Fe Cnty. Bd. of Cnty. Comm'rs*, 2005-NMSC-021, ¶ 26, 138 N.M. 82, 117 P.3d 240; *see* NMSA 1978, § 39-3-1.1(D) (1999); *see also* Rule 1-074(R). The question before us is a legal question[1] that requires us to interpret a statute, which we review de novo. *See Rio*

---

[1]Plaintiff argues that the Board's decision was arbitrary and capricious, not supported by substantial evidence, outside of the scope of the Board's authority, and otherwise not in accordance with the law. These arguments all amount to the same claim—that the Board erred as a matter of law in its interpretation of Section 10-12B-9(C)(1). Thus, we need not address each assertion individually.

*Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶¶ 16, 17, 133 N.M. 97, 61 P.3d 806.

{6} Generally, "[i]n construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature." *Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545. "In determining legislative intent, [appellate courts] look to the plain language of the statute and the context in which it was enacted, taking into account its history and background." *Pirtle v. Legis. Council Comm. of N.M. Legislature*, 2021-NMSC-026, ¶ 14, 492 P.3d 586. "[W]here the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others." *N.M. Real Estate Comm'n v. Barger*, 2012-NMCA-081, ¶ 7, 284 P.3d 1112 (internal quotation marks and citation omitted). Moreover, "[w]e consider all parts of the statute together, reading the statute in its entirety and construing each part in connection with every other part to produce a harmonious whole." *Dep't of Game & Fish v. Rawlings*, 2019-NMCA-018, ¶ 6, 436 P.3d 741 (alterations, internal quotation marks, and citation omitted).

{7} Section 10-12B-9(C) states,

> C. For a judge or justice who initially became a member after June 30, 2005 but on or before June 30, 2014, the amount of monthly pension is an amount equal to the sum of:

(1) for service credit earned on or before June 30, 2014, an amount equal to one-twelfth of the salary received during the last year in office prior to retirement multiplied by the product of three and seventy-five hundredths percent times the sum of the *number of years of service*; and

(2) for service credit earned on and after July 1, 2014, an amount equal to one-sixtieth of the greatest aggregate amount of salary received for sixty consecutive, but not necessarily continuous, months in office multiplied by the product of three and one-half percent times the number of years of service credit.

(Emphasis added.) It is the meaning of "years of service" in the first subsection of the calculation that represents a member's service that is at issue in this appeal.

"Years of service" is defined in the JRA as

a period of time beginning on the date a person commences to hold office as a judge or justice because of appointment or election and ending on the date a person ceases to hold office as a judge or justice because of expiration of the judge's or justice's term, voluntary resignation, death or disability and shall include any fractions of years of service.

Section 10-12B-2(W).[2]

{8} The crux of Plaintiff's argument is that because the JRA provides a definition of "years of service" in Section 10-12B-2(W), we must plunk that definition into Section 10-12B-9(C)(1) so that the entire tenure of a member's service is taken into

---

[2]The 2014 version of Section 10-12B-2 was in effect when Plaintiff filed his claim for benefits. The 2023 amendment of Section 10-12B-2 renumbered the "years of service" subsection, but the definition remains the same. *Compare* § 10-12B-2(V) (2014), *with* § 10-12B-2(W). We reference the most recent version of the statute for clarity.

account for the first prong of the calculation. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (noting "the plain language of a statute is the primary indicator of legislative intent" and "where several sections of a statute are involved, they must be read together so that all parts are given effect"); *Cadena v. Bernalillo Cnty. Bd. of Cnty. Comm'rs*, 2006-NMCA-036, ¶ 15, 139 N.M. 300, 131 P.3d 687 ("When words are defined in the statute, we must interpret the statute according to those definitions, because those definitions reflect what the legislative intent is.").

{9}     PERA argues that to give effect to the intent of the Legislature we must go beyond the plain language of the statute and conclude that "years of service" in Section 10-12B-9(C)(1) refers to the years of service credit the member has accumulated between July 1, 2005 and June 30, 2014. We agree with PERA and explain.

{10}     We start by providing an overview of the relevant statute. Section 10-12B-9(C) provides a pension calculation that requires the sum of two figures. The first figure reflects payment for a member's service between July 1, 2005 and June 30, 2014. Section 10-12B-9(C)(1). The second represents payment for a member's service from July 1, 2014 onward. Section 10-12B-9(C)(2). A 2014 amendment to Section 10-12B-9 created this two-step pension calculation, and therefore we turn to the history and background of the amendment to determine the Legislature's intent.

*See Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350 ("In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background.").

{11} Before 2014, NMSA 1978, Section 10-12B-9(C) (2005) read: "In the case of a new judge or justice who initially became a member on or after July 1, 2005, an amount equal to one-twelfth of the salary received during the last year in office prior to retirement multiplied by the product of three and seventy-five hundredths percent times the sum of the number of years of service." In 2014, the calculation was amended so that members who started their service between the 2005 and 2014 amendments, the 2005 calculation's pension factor remained for the calculation of benefits for that period, but a new calculation with a lesser pension factor was enacted for the time period going forward. *Compare* § 10-12B-9(C) (2005) (pension factor of 3.75 percent), *with* § 10-12B-9(C)(1) (pension factor of 3.75 percent), *and* § 10-12B-9(C)(2) (pension factor of 3.5 percent). An even lesser pension factor was adopted to calculate the total benefits for members who initially became members on or after July 1, 2014. *Compare* § 10-12B-9(D) (pension factor of 3.25 percent), *with* § 10-12B-9(C)(2) (pension factor of 3.5 percent).

{12} The decrease in the pension factor for the second prong of the equation in Section 10-12B-9(C)(2) and for members who start their tenure after June 30, 2014,

*see* § 10-12B-9(D), demonstrates a legislative intent to decrease the amount of benefits paid out to the relevant members. The Legislative history, found here in fiscal impact reports, confirms this. It reveals that the newer, lesser pension factor increases the solvency of the Fund while not decreasing any retirement benefits the members earned between 2005 and 2014. *See* Draft Fiscal Impact Report House Judicial Committee Substitute for H.B. 33 (Draft FIR H.B. 33), *Fiscal Implications*, at 2 (N.M. Feb. 11, 2014), https://www.nmlegis.gov/Sessions/14%20Regular/firs/HB0033.PDF (noting that "[t]he bill has a positive fiscal impact on the . . . Fund"); Draft FIR H.B. 33, *Significant Issues*, at 3 ("The proposed changes to the benefit structure will enable the . . . Fund to reach a 100 percent funded ratio in 30 years. According to the American Academy of Actuaries, plans should have the objective of accumulating assets equal to 100 percent of a relevant pension obligation."); Draft FIR H.B. 33, *Alternatives*, at 3 ("The [L]egislature may want to consider requiring working retiree judges to comply with PERA's return-to-work rules for state employees that include nonrefundable employee contributions."); Draft FIR H.B. 33, *What Will Be the Consequences of Not Enacting this Bill*, at 3 ("The judicial retirement plans will continue to provide a more generous pension benefit than what is currently provided to public employees, public safety employees and teachers. As the Fund continues to decline, more severe benefit cuts and cash infusions may be required in the future.").

{13}     Plaintiff argues against this Court using fiscal impact reports to determine legislative intent because the fiscal impact reports were not reviewed by the Board when making its decision. However, our review is de novo, so the Board's failure to review the authority does not affect on our review. *See Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 17 (noting our review is de novo); *Archuleta v. Santa Fe Police Dep't, ex rel. City of Santa Fe*, 2005-NMSC-006, ¶ 31, 137 N.M. 161, 108 P.3d 1019 (determining that a de novo standard of review "means that appellate courts can and must apply the appropriate law").

{14}     Plaintiff further argues fiscal impact reports are not persuasive authority. *See Lujan Grisham v. Reeb*, 2021-NMSC-006, ¶ 33, 480 P.3d 852 ("Furthermore, the [fiscal impact report] was authored by the Legislative Finance Committee; it is not an authoritative source of legislative history, but only a forecast of the fiscal impact of the proposed bill."). The appellate authority on this issue is mixed. *Compare State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶¶ 34-36, 117 N.M. 346, 871 P.2d 1352 (using fiscal impact reports as persuasive authority), *and State v. Montano*, 2022-NMCA-049, ¶¶ 15, 16, 517 P.3d 267 (using fiscal impact reports as persuasive authority), *with Reeb*, 2021-NMSC-006, ¶ 33 (refusing to use fiscal impact reports as persuasive authority). However, *Gallegos* analyzes the issue with the most specificity. 1994-NMSC-023, ¶¶ 34-36. *Gallegos* compared "contemporaneous documents, presented to and presumably considered by the legislature during the

8

course of enactment of a statute" with "[s]tatements of legislators, after the passage of the legislation," determining the first was authoritative and the second was not. *Id.* ¶ 35 (emphasis, internal quotation marks, and citation omitted). In doing so, our Supreme Court "expressly restrict[ed] consideration" of such materials "to cases in which the statutory meaning is unclear." *Id.* ¶ 36. In contrast, *Reeb*, does not address *Gallegos* and cites no authority for its refusal to consider fiscal impact reports. *Reeb*, 2021-NMSC-006, ¶¶ 32, 33. *Reeb* also concludes the argument supported by the fiscal impact report would be an "absurd" interpretation of the statutes at issue, *id.* ¶ 32, a circumstance not present in *Gallegos*, 1994-NMSC-023, ¶ 36, or this case. Thus, we determine fiscal impact reports, which are "contemporaneous documents, presented to and presumably considered by the [L]egislature during the course of enactment of a statute," may be used to determine legislative intent in this case. *See id.* ¶ 35. We now return to Section 10-12B-9(C)(1) and to our interpretation of its history.

{15}   The 2014 amendment to Section 10-12B-9 increased the maximum judicial pension benefit from 75 percent to 85 percent. *Compare* § 10-12B-9(C) (2005) (75 percent cap), *with* § 10-12B-9(F) (85 percent cap). Plaintiff also claims that Section 10-12B-5(G) and (H)(5) increased the potential pension for members. Plaintiff argues these parts of the statute demonstrate a "balancing act" wherein the Legislature was both attempting to increase the amount in the Fund while also

9

increasing the potential available amount of judicial retirement pension. We disagree that the JRA demonstrates such a "balancing act."

{16} First, as PERA notes, an increase in the cap "may create an incentive to work longer and decrease the time the employee is collecting a pension." *See* Fiscal Impact Report for Senate Finance Committee Substitute for S.B. 27, *Significant Issues*, at 3 (Mar. 9, 2013), https://www.nmlegis.gov/Sessions/13%20Regular/firs/SB0027.pdf. Thus, the increased cap demonstrates an intent to increase the Fund rather than an intent to provide increased benefits to members.

{17} Second, we turn to Section 10-12B-5(G) and (H)(5), which both deal with the purchase of service credit. Section 10-12B-5(B) allows members who have previously withdrawn contributions to purchase them back. Section 10-12B-5(G) provides that "[a] member shall be refunded, after retirement and upon written request filed with the association, the portion of the purchase cost of service credit purchased pursuant to the provisions of this section that the association determines to have been unnecessary to provide the member with the maximum pension applicable to the member." Section 10-12B-5(H)(5) states that "a member may purchase service credit in monthly increments," but "the purchase of service credit . . . cannot be used to exceed the pension maximum." Both of Subsections (G) and (H)(5) assure that the purchase of service credit is not out of step with the pension

10

the member has earned. They do not demonstrate an intent to provide increased benefits to the members of the Fund.

{18} Plaintiff next argues that a bill substitution of the 2014 amendment to Section 10-12B-9 is persuasive authority. In the 2014, House Bill 33 was replaced by a House Judiciary Committee (HJC) substitute to House Bill 33, which became the final version of the bill signed into law. *Compare* H.B. 33, 51st Leg., 2nd Sess., § 5(C), at 16 (N.M. 2014), https://www.nmlegis.gov/Sessions/14%20Regular/bills/house/HB0033.pdf, *with* House Judiciary Committee Substitute for H.B. 33, 51st Leg., 2nd Sess., § 6(C), at 23-24 (N.M. 2014), https://www.nmlegis.gov/Sessions/14%20Regular/bills/house/HB0033JCS.pdf, *and* § 10-12B-9. The HJC substitute included no relevant change to Section 10-12B-9(C)(1). *Compare* H.B. 33, § 5(C), at 16, *with* House Judiciary Committee Substitute for H.B. 33, § 6(C), at 23-24. However, Section 10-12B-9(C)(2) was amended from "for service credit earned on and after July 1, 2014, an amount equal to one-twelfth of the salary received during the last year in office prior to retirement multiplied by the product of three and one-half percent times the sum of the *number of years of service*," H.B. 33, § 5(C)(2), at 16 (emphasis added), to change the calculation to "for service credit earned on and after July 1, 2014, an amount equal to one-sixtieth of the greatest aggregate amount of salary received for sixty consecutive, but not necessarily continuous, months in office multiplied by the product of three and one-half percent times the *number of years of service credit*." House Judiciary

11

Committee Substitute for H.B. 33, § 6(C)(2), at 24 (emphasis added). Plaintiff argues that the change from "years of service" to "years of service credit" in Section 10-12B-9(C)(2) demonstrates the Legislature knew the difference and intentionally included "years of service" in Section 10-12B-9(C)(1). This assertion goes against the grain of the legislative intent identified in this opinion, and indicates a drafting error wherein the Legislature caught a mistake in Section 10-12B-9(C)(2) that it did not fix in 10-12B-9(C)(1).

{19}     Plaintiff also claims that to accept the construct provided by PERA would read the defined term "years of service" out of existence contrary to *Cobb v. State Canvassing Board*, 2006-NMSC-034, 140 N.M. 77, 140 P.3d 498. **[BIC 14-15]** However, *Cobb* states, "We will not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, [or] correct a mistake or an absurdity that the Legislature could not have intended." *Id.* ¶ 34 (internal quotation marks and citation omitted). The effect of the plain language interpretation Plaintiff argues for would result in an absurdity. Plaintiff claims that he—and other members in his position—are entitled to a monthly pension that includes double payment for his service from July 1, 2014, onward. This is because they would be entitled to payment that includes a multiplier that represents their service from July 1, 2005 to June 30, 2014, for both the first part of the calculation, § 10-12B-9(C)(1), and the second part of the calculation, § 10-12B-9(C)(2). Plaintiff would be entitled to almost $3,000

more a month in benefits if we were to interpret the statute as he argues. We will not interpret the statute in such a way because it would significantly increase benefits contrary to the Legislature's clear intent to increase the solvency of the Fund. *See Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 11, 146 N.M. 473, 212 P.3d 361 ("We must also consider the practical implications and the legislative purpose of a statute, and when the literal meaning of a statute would be absurd, unreasonable, or otherwise inappropriate in application, we go beyond the mere text of the statute.").

{20} Plaintiff acknowledges that this Court has the authority to look beyond the plain language of the statute when adhering to the plain language would lead to an unreasonable result, but contends the plain language of the statute is reasonable and clear, so we do not have such authority in this case. Plaintiff argues that *Gallegos*, "states a limited exception as opposed to a general rule," regarding departing from the plain language of a statute. Plaintiff is correct that the opinion states, "[I]f the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the [L]egislature's selection from among competing policies or adoption of one of perhaps several ways of effectuating a particular legislative objective." *Gallegos*, 1994-NMSC-023, ¶ 22.

{21} However, *Gallegos* also states, "[C]ourts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning." *Id.* ¶ 23. This is the case here. A plain reading of the statute negates the legislative intent to increase the longevity of the Fund. It also is in contrast to the structure of the statute, which includes a calculation that separately addresses the time a relevant member has served between July 1, 2005 and June 30, 2014, in Section 10-12B-9(C)(1), and the time they have served July 1, 2014, and beyond in Section 10-12B-9(C)(2). Further, it can be explained by a drafting error when amending the statute to provide members the benefits they earned from 2005 to 2014 while decreasing their benefits going forward.

{22} Interpretation of Section 10-12B-9(C)(1) also implicates Section 10-12B-5(A) of the JRA, which states, "In no case shall any member be credited with a year of service for less than twelve months of service in any calendar year or more than a month of service for all service in any calendar month or more than a year of service for all service in any calendar year." This subsection indicates that the Legislature was focused on members being given credit for only the time they

14

actually worked; surely it did not intend to give members double credit, as Plaintiff suggests. Plaintiff argues that since Section 10-12B-5(A) deals with the accumulation or loss of service credit, it does not address employees' receipt of compensation and is not in conflict with Section 10-12B-9(C). This argument ignores our edict to give effect to the Legislature's intent. *See Valenzuela v. Snyder*, 2014-NMCA-061, ¶ 16, 326 P.3d 1120. In referencing "for service credit earned" in both Section 10-12B-9(C)(1) and (C)(2), the Legislature indicated the calculation of benefits was based on the actual service the members provided.

{23} Plaintiff finally notes that the term "years of service" appears in four locations in Section 10-12B-9, and not following the plain language "would result in the patently illogical situation wherein the same defined term would mean one thing in the single prong calculations and another different thing in the two-prong calculations." We disagree that this is patently illogical. As we noted above, our analysis indicates that the Legislature simply made a drafting error when amending the statute in order to provide members the benefits they earned from 2005 to 2014 while decreasing their benefits going forward. It is reasonable to use the term differently in enacting a single prong calculation and the subsequent two prong calculation.

{24} In going beyond the plain language, and reading Section 10-12B-9(C)(1) and (C)(2) together and in the context of the statutory scheme as a whole, we conclude

that "years of service" in Section 10-12B-9(C)(1) refers to the members' years of service credit earned between July 1, 2005 and June 30, 2014. In interpreting the statute this way, a member is given credit for their service between July 1, 2005 and June 30, 2014, via Section 10-12B-9(C)(1); given credit for their service from July 1, 2014, forward via Section 10-12B-9(C)(2); and not given double credit for any service.

**CONCLUSION**

{25}    We affirm the Board's conclusion.

{26}    **IT IS SO ORDERED.**


_____
**MICHAEL D. BUSTAMANTE, Judge,
retired, Sitting by designation**

**WE CONCUR:**


_____
**KRISTINA BOGARDUS, Judge**


_____
**ZACHARY A. IVES, Judge**